# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **GUADALUPE MARES, a/n/f A.N.** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:17-cv-3461** |
| | § | |
| **GARLAND INDEPENDENT** | § | |
| **SCHOOL DISTRICT, MICHELLE** | § | |
| **BURFORD, LESLIE COBURN** | § | |
| **GRAYDENE BROWN, CAROL** | § | |
| **CAMPBELL, JENNIFER BENAVIDEZ** | § | |
| **and MICHAEL ROELL,** | § | |
| **Defendants** | § | |

## FIRST ORIGINAL COMPLAINT

**NOW COMES** "A.N."(herein also termed the "Student") by and through his next friend and legal guardian, Guadalupe Mares, (collectively termed "the Plaintiffs" herein) and files this *First Original Complaint* alleging that the Garland Independent School District (hereinafter referred to as "GISD" or "School District"), Michelle Burford, Leslie Coburn, Graydene Brown, Carol Campbell, Jennifer Benavidez and Michael Roell, all Individually (and hereinafter collectively termed "the School District Defendants" or Defendants), violated Plaintiffs various rights, as more specifically pled herein. Plaintiffs reserve the right to re-plead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof, Plaintiffs would respectfully show this tribunal the following:

## I. BRIEF INTRODUCTION TO THE CASE

1.  A.N. is now 16 years old and has moderate intellectual disabilities (formerly known as "Mental Retardation"). He has been diagnosed with Autism Spectrum Disorder self-contained.  For all pertinent times relevant to this case he received Special Education

services at the Garland Independent School District, and as such may be considered a person

with a disability pursuant to *Section 504 of the Rehabilitation Act of 1973*, 29 U.S.C. §794

("Section 504") and the *Americans With Disabilities Act*, 42 U.S.C. §12101 et seq. ("ADA").

2.      Over the course of A.N.'s time at the District, he was sexually assaulted by Michael Roell,

a GISD teacher, who was a well-known perpetrator to school district officials for physically

assaulting another child (A.S.).  In fact, in December of 2015, Roell took another Special

Education student A.S.[1] to the bathroom and when he tried to get away from Roell, Roell

restrained A.S., and then forcefully came down with his arm, breaking the child's humerus

bone.[2] A.S.'s mother attempted to have Roell terminated from employment.  Instead District

Officials, including Michelle Burford and Leslie Coburn, defended Roell and turned a *blind*

*eye* to the incident, even though she and other District personnel, including Defendant Carol

Campbell, a Nurse, had an absolute duty under state law to report the incident as abuse,

*see* Texas Family Code §261.101, and failed to do so.

3.      The School District refused to correctly investigate the allegations or any of the effects of

the incident on A.S. Instead, District personnel, including and especially Graydene Brown,

transferred Roell to another specific classroom (at the Hudson Middle School ALE or "Life

Skills Classroom")[3] also for disabled children where ("you guessed it") he did it again, but

---

[1] A.S. also has a case against the Garland ISD and Roell at 3:17-cv-1708, in this same District (Northern) and Division (Dallas).

[2] There is a video of the incident.

[3] In fact Roell was switched out with another teacher, ostensibly because that teacher had inappropriate contact with a disabled female student at the Hudson Middle School. Based upon the record, it seems that male teacher upon female student contact is taken seriously, but male teacher upon male student is not.

this time to a number of other male students, including J.H.[4]. Sadly, his known assaultive behaviors became more extreme and were also of a sexual nature.[5]

4.    During the Spring of 2016 semester, many of the other students in class were beginning to "act out" at home, especially during periods of toileting. One student took his clothing off in class and would start masturbating.[6] A number of parents met with and complained to Middle School Officials, including Ms. Benavidez, the Principal of the school, about specific concerns about their children and Roell but none were ever investigated. Finally, in May of 2016 it became overt that Roell had sexual contact with the most severely disabled students in the classroom, and he was soon removed from the position.

5.    Even with this explicit knowledge, the School District still failed and refused to follow any of the relevant jurisprudence, case law, regulations, OCR Guidelines, State Law, TASB Directives or their own policy and procedures regarding investigating the allegations that A.N., a student with a disability, was a potential victim of physical and sexual harassment and assault. Moreover, and in any case, the School failed to remedy any of the effects of the abuse, sexual harassment and assault that A.N. experienced.

6.    Sadly, there is not a week that goes by where there is not some media story about the plight of a young person who is bullied, harassed, assaulted, or even sexually assaulted at their

---

[4]J.H. also has a case against the Garland ISD and Roell at 3:17-cv-01776-C, in this same District (Northern) and Division (Dallas). Unlike many of the other male students A.N. can speak.

[5]Now, in retrospect, we can easily surmise as to why A.S. was trying to run away from Roell after he took A.S. to the bathroom.

[6]A sure sign that something traumatic had recently happened in that child's life.

school. Frankly, it is a national epidemic. Unlike the task of containing the spread of a flu virus by means of vaccines and treatment, this type of epidemic is particularly difficult to treat because often the school district itself, as in A.N.'s situation, is part of the illness and has refused, and continues to refuse to recognize its own responsibility.

7.      For the families of children,  there is nothing worse than seeing their own child suffer at  the hands of teachers and education professionals who are supposed to help kids not intentionally hurt them. To give meaning to their child's experience they feel compelled to tell their story. The family feels compelled to tell his story in hopes of a healing effect for both the Student and his family members. The healing and empowering effect is even more pronounced when the story is told before a  Judge, as the Plaintiffs have chosen to do in their case, to have a  bright light and sanitizing effect of federal law as well as the Court's focus on this important issue and the School District's failures.

## II. JURISDICTION

8.      A.N. and his mother, are both citizens of the State of Texas, and he was at all pertinent times a student in the Garland Independent School District.

9.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1331 and §1343 because the matters in controversy arise under the United States Constitution and laws of the United States. In addition, jurisdiction is conferred upon this Court pursuant to the Americans With Disabilities Act (ADA) Section 504, Title IX of the Education Amendments of 1972 and 42 U.S.C. §1983 (Section 1983).

## III.  VENUE

10.     Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions

giving rise to the Plaintiffs claims occurred in the Northern District of Texas.

## IV.  <u>PARTIES</u>

11.    A.N. lives in Texas and was a student at the Garland Independent School District at the time

of the incidents described herein. A.N. is a person with a disability for the purposes of this

case. He is the son of Guadalupe Mares, and currently lives at  2510 529 Rivercove, Garland,

Texas 75044.

12.    Defendant Garland Independent School District is a school district organized under the laws

of the State of Texas. They may be served by and through their Interim Superintendent, Dr.

Deborah Cron, at 501 South Jupiter, Garland, Texas, 75042.  Service may be waived by their

attorneys of record, the Honorable Nona Matthews of Walsh, Gallegos, Trevino, Russo and

Kyle P.C., 105 Decker Court, Suite 600; Irving, TX 75062.

13.    Michelle Burford (formerly known as "Unknown School Administrator I") at all times

pertinent to this case was employed in a Supervisory capacity at the Garland Independent

School District and was sent to attend a meeting where Mrs. Schutt, mother of A.S., saw the

video of her son's injury. This person participated in the cover-up of the incident. This

person may be served by and through the District's Interim Superintendent, Dr. Deborah

Cron, at 501 South Jupiter, Garland, Texas, 75042. Service may be waived by the Honorable

Meredith Prykyl Walker of Walsh, Gallegos, Trevino, Russo and Kyle P.C., 105 Decker

Court, Suite 600; Irving, TX 75062.

14.    Leslie Coburn was the Principal at the Pathfinder Achievement Center, and at all times

pertinent to this case was employed in a Supervisory capacity at the Garland Independent

School District. She was knowledgeable about the acts and omissions of Roell and the abuse

A.N. experienced. This person also participated in the cover-up of the incident. This person may be served by and through the District's Interim Superintendent, Dr. Deborah Cron, at 501 South Juptier, Garland, Texas, 75042. Service may be waived by the Honorable Meredith Prykyl Walker of Walsh, Gallegos, Trevino, Russo and Kyle P.C., 105 Decker Court, Suite 600; Irving, TX 75062.

15.    Carol Campbell was the Nurse at the Pathfinder Achievement Center, and at all times pertinent to the case was employed in a Supervisory capacity at the Garland Independent School District. She was knowledgeable about the acts and omissions of Roell and the abuse A.N. experienced. This person also participated in the cover-up of the incident. This person may be served by and through the District's Interim Superintendent, Dr. Deborah Cron, at 501 South Jupiter, Garland, Texas, 75042. Service may be waived by the Honorable Meredith Prykyl Walker of Walsh, Gallegos, Trevino, Russo and Kyle P.C., Decker Court, Suite 600; Irving, TX 75062.

16.    Graydene Brown (formerly known as "Unknown School Administrator II") at all times pertinent to this case was employed in a Supervisory capacity at the Garland Independent School District and was a final decision-maker on employment related issues related to Roell, and also participated in the cover up of Roell's assaultive behaviors. This person may be served by and through the District's Interim Superintendent, Dr. Deborah Cron, at 501 South Jupiter, Garland, Texas, 75042. Service may be waived by the Honorable Meredith Prykyl Walker of Walsh, Gallegos, Trevino, Russo and Kyle P.C., Decker Court, Suite 600; Irving, TX 75062.

17.    Jennifer Benavidez was the Principal at the Chase Middle School, and at all times pertinent

to this case was employed in a Supervisory capacity at the Garland Independent School District and was knowledgeable about the acts and omissions of Roell and the mistreatment and abuse of children in his class, including J.H. and A.N. This person also participated in the cover up of the incident. This person may be served by and through the District's Interim Superintendent, Dr. Deborh Cron, at 501 South Jupiter, Garland, Texas, 75042. Service may be waived by the Honorable Meredith Prykyl Walker of Walsh, Gallegos, Trevino, Russo and Kyle P.C., Decker Court, Suite 600; Irving, TX 75062.

18.     Michael Roell was a teacher with the Garland Independent School District during all pertinent times during the incidents made the basis of this complaint. He is a Defendant in this cause in his individual capacity. It is unknown where he lives at this time, and he will be served individually.

## V.  <u>STATEMENT OF FACTS</u>

A.     ABOUT A.N.

19.     A.N. was born on August 22, 2001. During a significant period that makes the basis of this complaint, he was a student at Hudson Middle School at the Garland Independent School District. His eligibility criteria are Intellectual Disability and Other Health Impairment.

20.     A.N. can communicate, although he has problems with expression. He can follow small two-step instructions. He is social, and talks with other children. However, academically A.N. struggles with reading and writing.

B.     HISTORICAL BACKGROUND OF SCHOOL DISTRICT LIABILITY

    1.     Title IX Of The Educational Acts of 1972

21.     The Educational Acts of 1972 passed through Congress as Public Law No. 92-318, 86 Stat.

235 (June 23, 1972) and codified at 20 U.S.C. §§ 1681 through 1688. It is commonly known

as "Title IX" and states (in part) that:

> "No person in the United States shall, on the basis of gender, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."

It is intended to remedy the effects of discrimination based upon sex, gender or gender

stereotypes. Moreover it is to assure that a student is not a victim of bullying, harassment,

sexual harassment, assault or sexual assault because of their membership in this protected

class. The Department of Education also promulgated rules to help implement Congress'

intent at 34 C.F.R. §106.1, which became effective as early as July 1, 1975.[7]

22.   From the inception of Title IX the United States Department of Education ("DOE") in their

*Office for Civil Rights* (OCR) issued policy guidance on discriminatory harassment. They

did so on discrimination based upon race (*see* 59 Fed. Reg. 11448 (Mar. 10, 1994) and later

regarding harassment based upon sex ["Title IX"] (*see* 62 Fed. Reg. 12034 [Mar. 13, 1997]).

These policies made clear that school personnel must understand their legal obligations to

address harassment based upon sex, gender and gender stereotypes and further, that they

were in the best position to recognize and prevent the harassment, to lessen the harm to

---

[7].   They include but are not limited to 34 CFR ¶106.8(a) [adopting responsible person]; 106.8(b) [adopting grievance procedure]; 106.9 [must disseminate policy and make continuing steps to do so under the circumstances]; 106.31(b) [forbidding discriminating on the basis of sex by providing  different services or failing (or denying) to provide services based upon sex or gender]; 106.31(d) [shall develop and implement procedures to assure non-discrimination]; 106.33 [must develop comparable facilities and services]; 106.34 [must provide equal access to classes and school]; 106.36 [can't discriminate in counseling services]; 06.37(a)(2) [cannot provide financial assistance to entity that discriminates based upon sex or gender]; 106.38 [making employment available cannot discriminate based upon sex or gender]; 106.51(a)(3)[ [1998].

students if, despite their best efforts, harassment continued to occur and importantly, remedy the effects of the harassment.

2.     Section 504 Of The Rehabilitation Act of 1973

23.     The Rehabilitation Act of 1973, Public Law 93–112, 87 Stat. 355, enacted September 26, 1973), and is codified at 29 U.S.C. §701 *et seq*.  It replaced the Vocational Rehabilitation Act of 1973, to extend and revise the authorization of grants to States for vocational rehabilitation services, with special emphasis on services to those with the most severe disabilities.  It established special responsibilities with the Secretary of Health, Education, and Welfare for coordination of all programs with respect to individuals with disabilities within that Department.  Regulations were promulgated so as to assure schools followed Section 504 requirements.[8]

3.     The Americans With Disabilities Act of 1990

24.     The *Americans with Disabilities Act of 1990* (ADA) was enacted by the U.S. Congress in 1990 and was signed into law on July 26, 1990 by then President George H. W. Bush.  The ADA was intended as a wide-ranging civil rights law that prohibited, under certain

---

[8]. 34 C.F.R. §104.1 [purpose- discrimination based upon disability prohibited]; 104.2 [applies to entities receiving federal monies]; 104.3 [defines disability]; 104.4 [handicapped person may not be excluded from or denied benefits, or subjected to discrimination based upon disability] (b)(1) [discriminatory actions prohibited]; 104.7 [must designate 504 Coordinator and inform person of grievance procedures]; 104.8 [provide continuing notice of persons rights and remedies]; 104.32 [notify parents of school district's duties]; 104.33(b) [must provide educational services to the same extent as non-disabled peers]; [ 104.34 [student must be educated in "least restrictive environment" and in "most inclusive manner"; must provide comparable services to person with disability as compared to person without disability]; 104.36 [must provide procedural safeguards including right to an impartial hearing]; 104.61 [procedural provisions of Title VI of Civil Rights Acts of 1964 §100.6-100.10, part 101 are applicable to Section 504].

circumstances, discrimination based on disability in all public environs. It afforded persons

with a disability and victims of discrimination based upon disability, the same protections

afforded Americans, as noted in the *Civil Rights Act of 1964*, which made discrimination

based on race, religion, sex, national origin illegal.  Disability was defined by the ADA as

"a physical or mental impairment that substantially limits a major life activity."  Importantly,

any determination of whether any particular condition is considered a disability, or if there

is discrimination based upon disability, is made on a case by case basis. The Department of

Justice promulgated regulations related to the ADA.[9]

4.      Guidelines From The Office Of Civil Rights

25.     In 1994 the DOE *Office of Civil Rights* ("OCR") produced policy guidance entitled *Racial*

*Incidents and Harassment Against Students At Educational Institutions, Investigative*

*Guidance*. 59 Fed. Reg 47 (March 10, 1994).  It set the professional standards of care for

investigating and addressing harassment, whether in general or when based upon sex or

gender, religion or nationality, or disability.

26.     On March 13, 1997, the OCR, after public hearings, produced *Sexual Harassment Guidance*

---

[9]. 35 C.F.R. §101 [purpose - discrimination based upon disability prohibited]; 102
[applies to all services, activities and programs provided by public entities]; 103 [shall not be
construed to apply a lesser standard than the standards applied under Title V of the
Rehabilitation Act of 1973]; 106 [notice to interested persons to apprise such persons of the
protections against discrimination]; 107 [designation of responsible employee to coordinate
compliance efforts];  108 [defines disability]; 130(a) [disabled person may not be excluded from
or denied benefits], (b) [discriminatory actions prohibited], (d) [administer services, programs
and activities in an integrated setting], (g) [no denial of equal services, programs or activities],
and (h) [ensure any safety requirements are based on actual risks]; 149 [individuals with
disabilities, shall not be excluded from participation in, or be denied the benefits of the services,
programs, or activities of a public entity, or be subjected to discrimination by any public entity].

delineated at 62 Fed. Reg. 12034.  It again noted that the relevant Title IX Standards were patterned after the anti-discrimination statutes under Title VII of the Civil Rights Act of 1964 and that District may be liable for teacher upon student sexual harassment as it does, as a matter of course, create a hostile educational environment for the student, fails to prevent reoccurrence of any harassment and fails to *remedy the effects of the harassment*.

27.    In 1998 the Supreme Court heard the case of <u>Gebser v. Lago Vista Independent School District</u>, 524 U.S. 274 (1998) which dealt with analysis that must be undertaken when determining whether or not a school district may be liable for teacher upon student sexual harassment, including the requirement that the necessary school official be on notice of the sexual contact.

28.    In 2000 the OCR and the *Office of Special Education* ("OSERS") also with the DOE sent out a *Memorandum* regarding harassment based upon disability (its also been known as the "Dear Colleague Letter").  It was sent to school boards and districts throughout the country. It discusses among other things the profound effects of bullying and harassment on a student with a disability, the laws and rules that apply (Title IX, Section 504, the ADA) and how such bullying and harassment, unrequited, affects a students equal opportunity under the laws noted therein.

29.    The letter also addresses the duty to respond to bullying and harassment and how to prevent it.  The number one item was to create a campus environment by first, training staff and by providing related supervision, so that they and the entire educational community become sensitive to disability related concerns regarding bullying and harassment.  Among other things it noted the importance of publicizing the issue, of non-toleration of harassment based

upon disability, of training to students, of counseling to both the victim and perpetrator, of ongoing monitoring and follow up on incidents and ongoing assessment of the school climate and policies and practices to assure effectiveness. Moreover, it reiterated the importance of assuring the parents received notice of all their procedural safeguards, including notice of who the Section 504 Coordinator was and the grievance procedures available, including those at the school level, state level and federal level.

30.     Since that time the OCR has promulgated a number of guidelines on how a school district should respond to bullying, harassment and assault, whether it be student upon student interactions or teacher upon student interactions and whether or not based upon disability (Section 504 and the ADA); sex or gender or gender stereotypes (Title IX) or race, religion or nationality (Title VI). They all reiterate the above noted duties to satisfy procedural guidelines (notice of who is the correct staff person to address concerns, complete an investigation in a timely and complete manner, give copies of all investigatory findings and right to appeal).

31.     They also all reiterate substantive duties to remedy the effects of the alleged harassment, regardless of a finding, including but not limited to require a response tailored to the needs of the student and situation, including providing psychological services to the student, providing or paying for counseling services for the student, placing the students in different classes or environments or removing the perpetrator from the hostile environment, providing a one-to-one aide, providing social skills services; and close monitoring of the victim.

5.      The State of Texas

32.     In 2008 the Texas Association of School Board's ("TASB") sent out a letter to all School

Districts to address all the items noted above. It noted the duty to address bullying and harassment whether it be based upon race, religion, nationality, disability, sex, gender or gender stereotypes and none of the above.  It re-urged the duty to have effective policies and procedures to address these issues. It incorporated by reference a directive from the U.S. Department of Health on "Best Practices" in prevention, including and especially the duty of the School Board to address the social environment of the school, complete a bullying assessment and train staff specifically in prevention.  Since that time the TASB has provided numerous updates on the issue as the case law has developed, federal guidelines get updated and Texas Law changes.

33.    These federal guidelines, directives and professional standards of care, over the course of time have become integrated into Texas law. First, there were increased penalties in the Juvenile Justice system for students who assaulted, bullied and harassed other students. In addition, the Texas Education Agency ("TEA") and the various local service centers working under TEA's purview developed and disseminated a significant amount of support material for school boards as to how to best prevent bullying and harassment in general, and bullying and harassment based upon disability, sex and gender in particular.

34.    Moreover, Texas Family Code §261.101(b) requires that any professional having cause to believe a child has been abused or neglected hhs a duty to re[prt such abuse or neglect to state officials, including Child Protective Services, the local police force, or both. In fact, the failure to do so may even rise to the level of a penal code offense. In any case, such failure is a violation of the Texas Educator's *Code of Conduct*, see Texas Administration Code §247.2 [Enforceable Standards at (1)(G), educator shall comply with state law and

regulations]; §247.3 [Ethical Conduct Towards Students at E, educator shall not engage in neglect or abuse of a student].

      6.      The Garland Independent School District

35.      The Garland Independent School District has long had and re-authorized policies and procedures related to *Student Welfare* and keeping students free from Discrimination, Harassment & Retaliation, that address among other things, including teacher upon student sexual harassment and assault.

36.      It sets out definitions of sexual harassment, information about reporting allegations of bullying and harassment, and their own investigatory procedures. It requires all allegations of bullying, harassment or assault based upon sex or gender or upon a student with a disability by a teacher, to be directed to the School District's Title IX or Section 504 Coordinator, and the family be given that person's contact information and notice of their procedural rights. A District's investigation needed to be completed in a timely manner, usually less than 10 days, so that a written report could be developed and interim action taken, as appropriate. The report must address whether or not prohibited contact occurred and must be filed with the relevant School District Official with a copy given to the family. If a student is not satisfied with the outcome of the investigation, they have the right to appeal the decision through the District's grievance procedure, with the TEA or even with the OCR with the U.S. Department of Education.

37.      The School Board Policies also note a non-exhaustive list of potential corrective actions based upon relevant case law, OCR and TASB Guidelines noted above. They include a training program for the victim and perpetrators, a comprehensive education program for the

school community and counseling to the victim and perpetrators(s). Again, there needed to be a system in place to follow-up and determine if new incidents had occurred and the effectiveness of those provided. There is also discussion of increasing staff monitoring and assessment of the problem.

C.   INCIDENTS AT THE GARLAND INDEPENDENT SCHOOL DISTRICT

    1.   The First Allegations of Abuse At The Garland ISD- Hudson Middle School

38.   In the late Fall of 2015 at the Hudson Middle school there was an allegation that a teacher, Mr. Kelly, who served in the self-contained classroom for the most disabled students may have had some inappropriate contact with a female disabled student. He was soon removed from the classroom. While all the parents in the classroom knew of the removal, none knew why, though obviously there were many suspicions. Nevertheless, there was no investigation by District Officials, as none of the children were interviewed, nor were their parents interviewed to see if any of the children had been acting in a manner in which sexual harassment or assault could be a consideration.

    2.   The Second Allegation Of Abuse At the District- Pathfinder Achievement Center

39.   Just around the same time period, and on or around 11:45am, on December 10, 2015, at the Pathfinder Achievement Center also with the Garland Independent School District, a nurse at the school, Carol Campbell contacted Nora Schutt, the parent of another child with a disability (A.S.), similar to A.N.

40.   Apparently A.S., on his first day at the Center, was taken to the bathroom by Michael Roell, at that time a staff member at the Achievement Center. On his return from the bathroom, A.S. tried to get away from Roell.  Roell initially reported that he accidently broke A.S. arm

when he tried to apprehend him. This incident was captured on video.

41.     Campbell told Mrs. Schutt that she had been watching A.S. for over an hour and that he had vomited, a reaction to the extreme pain he was experiencing. It is his mother's distinct impression that Campbell was downplaying the severity of the injury.

42.     Mrs. Schutt immediately picked up A.S. and transported him to Maul Family Practice in Rowlett. The attending physician performed an x-ray and examination which displayed a complete break of the humorous bone. A.S. was in extreme pain. The attending physician offered a special sling to assist A.S. with discomfort and stabilize the break and referred him to the hospital for further evaluation.  The attending physician also instructed parents to call the police immediately on the route to the hospital.

43.     Later that afternoon, at about 5:15 p.m., A.S.'s parents received a call from Nurse Campbell. She called to "check" on A.S. and the injury status. During this conversation, Mrs. Schutt informed Campbell [nurse] she would be in the school offices the next day to view a videotape of the incident in which A.S.'s arm was broken.

44.     Mrs. Schutt arrived at Children's Health Hospital in Dallas with her son and was seen by an orthopedic specialist, Dr. Leigha Eldridge. Dr. Eldridge confirmed that A.S. had suffered a humerus bone break and that in her professional opinion as an orthopedist, that the break was intentional.  She splinted the broken bone and explained that vomiting previously reported by the school nurse was a reaction to the pain A.S. was feeling. While additional examinations were performed, Children's Health Social Services were contacted and began their investigation. Mr. and Mrs. Schutt were interviewed as A.S.'s parents.

45.     In any case, the next day Mrs. Schutt requested to view video footage from her son's

classroom.  She met with the School Principal, Leslie Coburn and someone who identified themselves as School Advocate, now known to be Michelle Burford (formerly known as "Unknown School Administrator I").

46.     At first these two school district officials played the video too fast for mother to be able to see what exactly happened to her son. Mother asked them a number of times to slow down the tape so she could see what really happened to her child.  Finally they agreed to do so. The video showed that Michael Roell took hold of A.S.'s arm, turned it behind his back and held it in an "arm bar". Roell then "popped" his own arm and elbow up and powered it down in a violently forceful manner against A.S.'s arm, and broke the bone.

47.     Mrs. Schutt reports that these two persons were attempting to "guilt her" by constantly praising Roell and the Principal stated of Roell that "he's a father and a good man"  Further, that "Mr. Roell is one of our best teachers.  He takes kids home with him. You [Mrs. Schutt] are ruining a good man."  "Please don't ruin a good man." The Principal even had the audacity to say the child's arm had been broken before he came to school that day.  The "so-called" Advocate (formerly known as Unknown School Administrator I) advised the Principal "to be quiet." Apparently, Coburn and Burford were both more interested in protecting Roell and the School District than a child with a disability.

48.     At this point A.S.'s mother realized that Nurse Campbell also had definitely been downplaying the severity of his injury.  Neither Burford, Coburn or Campbell reported the incident to the appropriate state authorities, as required by the Texas Family Code.

49.     A.S.'s arm required three different arm casts over a period of almost three months. The injuries from the assault resulted in thousands of dollars of bills for the family.  When it gets

cold or rains, his shoulder hurts and he cries.  He is re-traumatized each time.  Despite the insistence of the Schutt family for his termination, the School District Defendants ignored the videotape of A.S.'s assault and the signs of Roell's predatory behavior.  In fact, Graydene Brown, (formerly known as "Unknown School Administrator II") transferred him to the Chase Middle School, where he switched out with the aforementioned Mr. Kelly and took his place.

50.    When Kelly left the Middle School he told A.N.'s mother to "watch out" for Roell. Evidently his assaultive behaviors were now well-known across the District.

51.    The School District failed to investigate the allegations of physical abuse by Roell.  They never questioned A.S. or his mother again, and to her knowledge never questioned any other students, or their parents, as to whether or not Roell had been abusive to their disabled child. They never reported their knowledge that A.S. was a victim of abuse, as required by the Texas Family Code and their own Ethical Standards for Educators.

52.    On or around January 5, 2016, Michael Roell was formally removed from the Pathfinder Academy and was sent to the Hudson Middle School.  He ended up in the same classroom with A.N. where he repeated his assaultive ways.

3.    The Second Round of Allegations Of Abuse At The Hudson Middle School

53.    In early February 2016, Cherish Hooper began observing changes in J.H.'s behavior, another Special Education student.  He began to withdraw from friends and family and started to prefer long hours alone in isolation.

54.    Apparently when Roell came to this ALE classroom he took J.H. and A.N. and other male students to the bathroom, even though these boys did not need his, or anyone's, assistance.

Apparently Roell covered his activities with the guise that he was helping to teach the boys to shake excess urine from their penis after urinating, hence his following them into the bathroom.

55.     Roell was so brazen about his actions that he actually kept what he called a "dick log," ostensibly to provide an educational *cover*[10] for his activities, even though neither J.H. or A.N. had a specific program addressing the need for assistance while in the toilet. Again the classroom Special Education Teacher and  the aides as well, all purportedly trained in providing services to extremely disabled children like A.N., and all well aware of Roell's "dick log", failed to see such behaviors as problematic and failed to the report the problem to appropriate authorities for investigation.

56.     As we now know Roell was masturbating the boys and himself in the bathroom.

57.     But the teacher and aide's failures don't end there.  On one occasion A.N. yelled out in class "... don't touch me Mr. Roell, ... or I'll report you to the police ..."  It was heard by an Aide (Yolanda Walker) who reported it to A.N.'s mother, but Walker failed to report the incident to anyone else.

58.     Also during the Spring of 2016 many of the male students were beginning to "act out" at home, especially during periods of toileting and bathing.  Another Aide (Justin Peppel) has (now) reported that one student would even take his clothing off in class and would start

---

[10]For some severely disabled students, who have no or limited self-help skills, they do have someone help them in the bathroom.  In order to have such assistance the child's *Admission, Review & Dismissal* ("ARD") Committee, formulated pursuant to the *Individuals With Disabilities Education Act*, must provide an *Individualized Educational Plan* ("IEP") 20 U.S.C. §1414(d); 34 C.F.R. §300.320, specifically addressing toileting needs.  Without a specific IEP on the topic, or any for that matter, no toileting related services may be provided.   There is no evidence that C.H or A.N. required such assistance.

masturbating[11] but apparently this concern was never reported to the parent and was never reported or investigated by District Officials.

59.    One parent, Rosendo Santos, has reported that he had multiple meetings with Middle School Officials, including Ms. Jennifer Benavidez, the School Principal during the Spring of 2016, about his specific concerns about his child's behaviors and Roell, but they were never investigated by Benavidez.  He also complained that he was never told about any of the reasons that the previous teacher (Kelly) had been removed.

60.    Another parent, Cassie Jimenez, also reported she too had multiple meetings with Middle School Officials, including Ms. Benavidez, about her concerns that her child also was having problems at home, and they too were never investigated.

61.    Another parent, Alisa Morales, also complained that her child was having unexplained outbursts at home.  She reports that she also inquired about why Kelly was removed in the fall and was not given any information about his removal by Benavidez.

62.    In any case, on or about the beginning of April 2016, J.H. celebrated his birthday. Roell and another district employee attended this party. Roell purchased large amounts of nickels to play video games but *only* for every boy at the party. A.N. also attended. His mother remembers that one boy reacted extremely negatively to Roell and tried to run away.  Mrs. Hooper also saw that Roell expended an observably long amount of time with the boys and felt that it was strange. All these occurrences signaled another "red flag" about Roell, but the staff member who also attended apparently did not have a problem with Roell's activities.

63.    In any case, after the birthday party, J.H.'s behaviors worsened.  He continued to be

---

[11]A sure sign that something had recently happened in that child's life.

withdrawn and would isolate himself in his bedroom.

64.     Later on in the month, Cherish received a call from Yolanda Walker, one of the aides in the classroom. During the conversation, Walker finally shared her concerns about J.H. displaying violent behavior toward Roell in the classroom. Cherish shared her concerns with Walker about her son's behaviors at home and inquired further about Roell's interactions with J.H.

65.     On or around May 11, 2016, Cherish received a call from A.N.'s  mother, who told Cherish that she had found out that her own child and also J.H. had both been sexually abused by Roell.

66.     She first learned, what everyone in the classroom knew, that Roell had been taking J.H. and A.N. to the bathroom and had been watching the children urinate and had been touching their penis, ostensibly to dry them off.  A.N.'s mother also told her that Roell was doing this with children naked.

67.     After the conversation, Cherish immediately took her son to the police. Police requested a statement from Cherish. A.N. and his mother also completed a statement for the police.

68.     On or around May 13th during a forensic interview J.H. was able to speak, in his own rather primitive way, about the sexual advances inflicted on him and A.N. by Roell.  The forensic interview detailed specific locations within the classroom where abuses took place. J.H. and A.N. both spoke about how Roell observed him and the other student urinate, would touch their genitals and how Roell would even masturbate in view of J.H.

69.     J.H. spoke about having to urinate openly and that he did not like to "shake it off" when Roell was around.  According to J.H.'s forensic interview, Roell would access specific areas

of the classroom and designated an area for students that got in trouble. J.H. found himself

in this area so Roell could separate him from the other students, another "red flag."

70.     When interviewed by the police Ms. Walker noted that Roell had no reason to go to the

bathroom with J.H. or any other student, yet he frequently did anyway, another "red flag."

Moreover, she now even questioned Roell about why he was following J.H. to the bathroom

and why he was always sitting close to him, all important behaviors. School officials were

aware of these behaviors by Roell but never investigated them.

71.     On or around May 16, 2016, Cherish notified the school principal, Benavidez, of the sexual

abuse by Roell. Benavidez promised that Roell would not return to the campus.

72.     By May 17th, all of the parents of the seventeen children in A.N.'s class had contacted

Cherish. Most communicated their accounts of how their children were also becoming more

challenging at home and even violent or withdrawn.

73.     Cherish learned that many of these same parents had contacted the school principal, Jennifer

Benavidez, about Roell, well-prior to May 11th as noted above.

74.     On or around May 18th Hudson Middle School Assistant Principal Ryder was interviewed

by the police and was noted to be Roell's supervisor.  He confirmed that J.H. and A.N. did

not need assistance in the restroom. Ryder stated that District policy and procedures only

allowed personnel that are dealing with students in the *Moving Toward Independence*

*Program* ("MTI") to have authorization to touch a student's penis or vagina if the employee

felt it was necessary. The MTI program was for students that had severe and profound

disabilities and were sometimes wheelchair bound.  Ryder stated that J.H. and A.N. were

considered higher functioning than students who needed such help, and there was no reason

that Roell should be assisting J.H. or A.N. or need to watch either urinate.

75.     On or around May 18th Roell was interviewed by the police, and for a second time he stated that A.N. liked to touch (him) and liked to be touched. During the interview, Roell referred to a log that Ms. Walker was in charge of as the "dick log".

76.     Roell admitted that he made students like J.H. urinate with the curtain or door open so he could watch them urinate.  He also admitted that he would put his hands on the child's penis and work with them on "shaking off" the urine from their penis.

77.     On or around May 19th, police interviewed Justin Peppel, an aide with the District. Apparently another child in the class was having issues with dropping his pants and masturbating.  In addition to this behavior, Peppel commented that school administrators were aware that Roell spent a lot of time with children when he was off work, and that this all seemed strange to him.

78.     On May 24th at a School Board meeting, brave parents of the students in A.N.'s class spoke on video about the insufficient response of Hudson School Principal, Benavidez, and other Garland Independent School District Administration staff to address the problems with Roell at Hudson Middle School.   They all complained that they had never received any information about why Kelly was replaced in the fall.   Though not explicit, none mentioned they or their child had been interviewed by anyone with the District to see if their child had been victimized by Kelly or later Roell.  They all complained they had never received any information about specific information by School District personnel as to why Roell had been replaced.  It only occurred by parent-to-parent.

79.     After Michael Roell's removal and subsequent arrest, on or around June 1st Hudson Middle

School personnel failed to immediately notify parents of these significant changes in their children's lives. For a student like A.N., significant changes, like the removal of a teacher, can take a while to get used to. In the meantime, students in A.N.'s class continued to act out.

80.     Not surprisingly, A.N. continues to have lasting and lingering effects of the sexual abuse he endured by the hands and eyes of Roell, predator and ex-teacher. A.N.'s injuries are the result of the acts and omissions of Defendant Roell and the indifference of the Garland Independent School District staff members including Burford, Campbell, Coburn, Brown and Benavidez.

81.     First, Roell never should have been hired to work again after the incident where he broke A.S.'s arm.

82.     Further, staff at the Chase Middle School failed to tell the Principal of the overt and troubling behaviors of Roell including and especially the fact all staff in the classroom knew that he was touching the penis of a number of males students in the classroom, including and especially J.H. and A.N.

83.     Nothing was done about Roell's behaviors and the sexual assaults on J.H. and A.N. and the effects upon them.

84.     As a student with a disability, A.N. has a right to be educated in a non-hostile educational environment. Those rights are further protected by applicable jurisprudence, case law, relevant regulations, directives from the United States Department of Education, *Office of Civil Rights,* State Law and rules and directives from the TASB.

85.     Moreover, and most importantly, the School District has also developed policies and

procedures to protect a student with a disability, like J.H. and A.N,. from such sexual harassment. Those policies gave both him and his parents a number of substantive rights. The District failed to provide such items.

86.    They include but are not limited to, first and foremost, the rights to receive notice of their procedural rights, whether it be because of his disability, or because of his status as a person who was sexually assaulted. The District failed to provide such items.

87.    Plaintiffs never received notice of who the Title IX or Section 504 Coordinator was for the District in regard to investigating allegations of the sexual harassment.

88.    They never provided information about the right to file a formal grievance with the School District.

89.    They never provided information about the right to file a formal grievance with the Texas Education Agency.

90.    They never provided the family information about the right to file a formal complaint with the Office of Civil Rights.

91.    The School District did not even follow their own policies and procedures requiring allegations of sexual harassment be investigated by the appropriate staff member.

92.    The School District did not even follow their own policies and procedures requiring allegations of abuse of a student with a disability be investigated by the appropriate staff member.

93.    The individual School District Defendants, Burford, Coburn, Campbell, Brown and Benavidez did not report the abuse to Child Protective Services or the police.

94.    The District never did anything to remedy the effects of the abuse on the student.

95.    The District never provided a psychological assessment of the Student.

96.    The District  never provided school-based counseling services to the Student.

97.    The District  never provided reimbursement to the parent for community-based counseling services to the Student.

98.    The District never provided an aide or shadow to observe him at the school.

99.    The District never provided a class or program on social skills that taught how to deal with the sexual harassment.

100.    The District failed to do anything to prevent the assault the Student experienced.

101.    The District failed to do anything to prevent the sexual harassment the Student experienced.

102.    The District failed to do anything to remedy the effects of the assault the Student experienced.

103.    The District failed to do anything to remedy the effects of the sexual harassment the Student experienced.

104.    Further, Michelle Burford, Leslie Coburn and Carol Campbell all acted to cover up the incident even though there was video showing Roell's abusive behaviors.

105.    In addition, Graydene Brown made a final employment decision to retain and transfer Roell to the Middle School even though there was video showing his abusive behaviors and by doing so, put J.H., A.N. and other students in harm's way and made them more vulnerable to Roell's assaultive behaviors.

106.    Last, even when Jennifer Benavidez had actual knowledge that a number of students in Roell's class were experiencing the types of behaviors of children who had experienced sexual abuse, she did nothing to investigate parental concerns.

## VI. <u>CLAIMS RELATED TO THE REHABILITATION ACT OF 1973</u>

107.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

108.   The Garland ISD receives federal funds and thus follows the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794

109.   The implemented regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

110.   Plaintiffs further assert that because the School District has failed to provide the student a safe and non-hostile educational environment, such failures as noted above, have together and separately, contributed to violating his rights pursuant to Section 504, and the federal rules and regulations promulgated pursuant thereto.

111.   As such, A.N. has a private cause of action for violation of the regulations promulgated under Section 504, due to the acts and omissions by the School District.

112.   Likewise, in addition and in the alternative, the failures denoted herein by the School District were a gross deviation from professional standards of care.

113.   The acts and omissions of the School District specifically undermined and interfered with his rights pursuant to Section 504, thereby he was a victim of discrimination based upon disability.

## VII.   CLAIMS RELATED TO THE AMERICANS WITH DISABILITIES ACT

114.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

115.   In addition and in the alternative to the above, the facts as previously described demonstrate violations of Title II of the *Americans with Disabilities Act*, 42 U.S.C. §12131, et seq ("ADA").

116.   The Student is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2).

117.   The School Board is a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance to be covered by the mandate of the ADA.

118.   The School Board and its schools are facilities and their operation constitutes a program and services for ADA purposes.

119.   Specifically, and separate and apart from his Section 504 cause of action, the Student alleges that the School Board failed and refused to reasonably accommodate and modify services to him, in violation of Title II of the ADA.

120.   The Student was a victim of discrimination based upon disability by the acts and omissions of the School District.

121.   The Student has a private cause of action against the School District for their failure to follow relevant regulations promulgated pursuant to the ADA.

122.   Such failures caused injuries to the Student.

## VIII. CLAIMS FOR RELIEF PURSUANT TO TITLE IX

123.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

124.   Title IX specifically notes the standards of liability for a public entity in regard to the Title IX claim. The claimant must be a member of a protected class; must be bullied, harassed or assaulted based upon membership in that class; the Defendant entity must be on notice as to the allegations; be deliberately indifferent to those allegations and the victim must have experienced a deprivation of educational opportunities and/or other damages.  A.N.. easily satisfies all these threshold requirements.

125.   Plaintiffs further contend that these failures of the Defendant School District to have effective policies, procedures, practices and customs in place to assure A.N. was not a victim of bullying, harassment, or assault based upon gender, or based upon stereotypes based upon gender, and due to such failures violated his rights pursuant to Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. § 1681 et seq., upon which he now seeks recovery.

126.   A.N. has a private cause of action against the School District for their failure to follow relevant regulations promulgated pursuant to the Title IX.

127.   A.N. experienced significant injuries thereby.

## IX.  CONSTITUTIONAL CLAIMS

128.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

129.   The facts as previously described above demonstrate violations of the Student's civil rights by Defendants, pursuant to the 4th Amendment to the United States Constitution, to be free from unreasonable seizure.

130.   In addition and in the alternative, the acts and omissions of the Defendants violate A.N.'s

right to bodily integrity, pursuant to the 14th Amendment to the U.S. Constitution.

131.    In addition and in the alternative, the acts and omissions of the Defendants violate A.N.'s

right to privacy, pursuant to the 14th Amendment to the U.S. Constitution.

132.    Moreover, and also in addition and in the alternative, the acts and omissions of the School

District Defendant violate A.N.'s rights pursuant to *Due Process Clause* the 14th Amendment

to the U.S. Constitution by failing to correctly supervise staff.

133.    Moreover, and also in addition and in the alternative, the acts and omissions of the School

District violate A.N.'s rights pursuant to the *Due Process Clause* of the 14th Amendment to

the U.S. Constitution by failing to correctly train staff.

134.    Moreover, the facts as previously described demonstrate violations of the Student's civil

rights by Defendants Roell, Burford, Coburn, Campbell, Brown and Benavidez pursuant to

the *Equal Protection Clause* of the 14th Amendment to the U.S. Constitution, as each had a

duty to keep A.N. as safe as non-disabled children and failed to do so.

135.    Additionally, the facts as previously described demonstrate violations of the Student's civil

rights by the School District pursuant to the *Equal Protection Clause* of the 14th Amendment

to the U.S. Constitution, as Roell treated A.N., a male student, differently than his female

peers.

136.    Further, the facts as previously described demonstrate *procedural* violations of the Student's

civil rights by the School District, pursuant to the *Due Process Clause* of the 14th

Amendment to the United States Constitution, as A.N.'s various rights were violated without

due process of law.

137.    Last, the facts as previously described demonstrate a *Civil Conspiracy* between all the

Defendants both named and unnamed to cover up for the injury to A.N. by Roell violating his rights under the *Due Process Clause* of the 14th Amendment to the U.S. Constitution.

## X.  RATIFICATION

138.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

139.   The Garland ISD ratified the acts, omissions and customs of school district personnel and staff.

140.   As a result, the Garland ISD is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of A.N.

## XI. PROXIMATE CAUSE

141.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

142.   Each and every, all and singular of the foregoing acts and omissions, on the part of the School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XII.  DAMAGES

143.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

144.   As a direct and proximate result of the Defendant's conduct, they are jointly and severally liable to A.N. who has suffered injuries and damages, for which he is entitled to recover herein including but not limited to:

    a.        Loss of educational opportunities;

      b.       Physical pain in the past;

      c.       Medical expenses in the past;

      d.       Mental anguish in the past;

      e.       Mental anguish in the future;

      f.       Mental health expenses in the future;

      g.       Physical impairment in the past;

      h.       Various out-of-pocket expenses incurred by his family but for the acts and omissions of the School District; and

145.    Attorneys fees and costs of the case, as permitted by law.

146.    In addition, all the Individual Defendants Roell, Burford, Coburn, Campbell, Brown and Benavidez are all liable to A.N. for punitive damages.

## XIII.  ADMINISTRATIVE EXHAUSTION

147.    The parties agree that administrative exhaustion, as otherwise required by the *Individuals With Disabilities Education Act* ("IDEA"), 20 U.S.C. §1415(l) is not warranted in this cause, as Plaintiffs make no claims related to the Student's right to a *Free Appropriate Public Education* ("FAPE") under IDEA, Section 504 or the ADA.

## XIV.  PLAINTIFFS REQUEST TRIAL BY JURY

## XV. PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays in the manner and particulars noted above, and in an amount sufficient to fully compensate him for the elements of damages enumerated above, and enter a judgment including but not limited to the following relief; recovery of attorney's fees and costs for the preparation and trial of this cause of

action, and for its appeal if required, pursuant to Section 504, the ADA, Title IX, 42 U.S.C. §1983 and 1988; and 42 U.S.C. §2000d et seq.; together with pre- and post-judgment interest, and court costs expended herein, and for such other relief as this Court in equity, or law, or both, deems just and proper.

Respectfully submitted,

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
Cirkiel & Associates, P.C.
SBN 00783829
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

Mr. Anthony O'Hanlon, ESQ.
Attorney & Counselor At Law
SBN 15235520
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]
ahanlon@somlaw.net [Email]
ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this the 18th day of December, 2017 a true and correct copy of the above and forgoing document was served on the parties listed below pursuant to the Federal Rules of Civil Procedure and the Court's electronic filing system.

Ms. Meredith Prykryl Walker, Attorney
Walsh Gallegos, P.C.
105 Decker Court, Suite 600
Irving, Texas 75062
(214) 574-8800 [Telephone]
(214) 574- 8801 [Facsimile]
<u>mwalker@wabsa.com</u> [Email]
Attorney For Garland Independent School District

/s/ Martin J. Cirkiel
Martin J. Cirkiel